Nott, J.,
delivered tbe opinion of tbe court:
In a case of joint or communal ownership where tbe parties complainant must be counted by thousands, but are entitled to be paid per capita, it is absolutely impossible for a court to render several judgments in favor of each complainant. Tbe recovery, therefore, must be, as against tbe defendants, for a sum in gross; and tbe amount so recovered must constitute a fund for distribution among tbe joint or communal owners.
In tbe present case it is a matter of public concern, as well as of private right, that, tbe controversy be brought to au end. It is not alone a mere litigation for dollars and cents affecting individual suitors; it is also a controversy affecting tbe whole *182 nationality and. disturbing the peace and order of society. To intensify the ill feeling which the controversy has aroused by sending’ a commissioner into the Cherokee country, and having him carry on there what practically would be a trial and controversy in regard to every individual complainant, is a proceeding which a court would not be justified in instituting unless it were an imperative necessity.
After hearing the suggestions of counsel, the court is of the opinion that the appointment of a commissioner to ascertain the actual number of freedmen existing when the first fund of $300,000 was distributed in 1886, the actual number existing when the second fund of $300,000 was distributed in 1890, the actual number which existed when the third fund of $6,640,000 was distributed in 1894, and'the further facts that each and all of these persons were (or were descendants of) the freedmen who existed when the treaty of July 19,1866, was made is not a necessity in this case and would be practical!y so involved, prolonged, and vexatious that if substantial justice can be done it should be avoided. The information before the court and in the archives of the Department of the Interior, it is believed, will enable the court to award substantial justice and to bring the controversy between the freedmen and the Cherokee Nation at once to an end. ■
There is now in the Interior Department a census of the freedmen, known as the Wallace roll. This census was taken by authority of law — the following statute of the United States:
“ That there be, and hereby is, appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $75,000, or so much thereof as may be necessary, to carry out the provisions of this act; and the amount actually expended shall be charged against the Cherokee Nation, on account of its lauds west of the Arkansas River, and shall be a lien on said lands, and which shall be deducted from any payment hereafter made on account of said lands. The said sum, or so much thereof as may be necessary, shall be, by the Secretary of the Interior, distributed per capita, first, among such freedmen and their descendants as are mentioned in the ninth article of the treaty of July 19,1866, between the United States and the Cherokee Nation of Indians; second, among the Delaware tribe of Indians incorporated into the Cherokee Nation by the terms of a certain agreement entered into between said Cherokee Nation and Delaware Indians, under the provisions of the fifteenth article of the aforesaid treaty, on the 8th day of April, 1867, and approved, respectively, by the President of *183 the United States and the Secretary of the Interior on the 11th day of April, 1867; and third, among the Shawnee tribe of Indians incorporated into the Cherokee Nation by the terms of a certain agreement entered into between the said Cherokee Nation and Shawnee Indians, under the provisions of the aforesaid article' and treaty, on the 7th day of June, 1869, and approved, respectively, by the President of the United States and the Secretary of the Interior on the 9th day of June, 1869, •in such manner and in such amount or amounts as will equalize the per capita payment made to Cherokees by blood in accordance with the act of the Cherokee legislature aforesaid, out of the sum of $300,000 appropriated by the act of March 3rd, 1883, aforesaid.
“Act 19th October, 1888 (25 Stat. L., p. 609).”
The above statute was supplemented at the next session of Congress by the following:
“ To enable the Secretary of the Interior to ascertain who are entitled to share in the per capita distribution of the sum of $75,000 appropriated by the act approved October 19th, 188S, entitled ‘An act to secure to the Cherokee freedmen and others their proportion of certain proceeds of land under the act March 3rd, 1883,’ and to make payment thereof the sum of $5,000, or so much thereof as may be necessary, and to compensate, in such sum as he may deem reasonable any duly authorized agent or agents acting for said freedmen, and rendering them aid in obtaining the allowance of said $75,000, the sum of $15,000, or so much thereof as may be necessary; and the amount so expended in ascertaining to whom said money shall be paid shall be charged against the Cherokee Nation on account of its lands west of the Arkansas Eiver, and shall be a lien on said lands, and shall be deducted from any payment hereafter made on account of said lands. And said Secretary is hereby authorized and directed to make inquiry and report to the next session of Congress what other sums of money, if any, have been appropriated by the Cherokee Nation in violation of their treaty obligations in reference to freedmen in said nation, and what sum would be required to secure to said freedmen those treaty rights in respect to the same.
“ Act 2d March, 1889 (25 Stat. L., pp. 980, 994).”
Under and by virtue of these statutes a commissioner was appointed by the Secretary of th¿ Interior, and by him the Wallace roll was made up.
The commissioner proceeded to the Cherokee country and the investigation was carried on by him under the following rules:
“ The sworn statements of all claimants must be corroborated by the affidavits of three witnesses, who must be citizens of the *184 Cherokee Natiou by blood, or whose names appeared on the authenticated rolls of Oherekee freedmen entitled to and exercising the privileges of Cherokee citizenship.
“ That the witnesses must be present during the examination of the claimant, and at its close the affidavit of the claimant must be read and any portions to which they could not swear they must so state.
“ That all business must be conducted with open doors.
“ That no cases would be placed in writing under oath of claimants that could not establish the fact of preliminary examination of having been owned by a citizen of the Cherokee Nation at the breaking out of the Avar of the rebellion.”
All of this evidence so. taken was returned to the Interior Department by the commissioner. The Department also received and considered additional evidence submitted by parties. The Department also, in 1890, sent two agents into the Cherokee country for the purpose of the revision and correction of the Wallace roll, who took further evidence, which was likewise submitted to the Department. With all of these means of information and after an investigation running through two years the Department revised and corrected the returns of the commissioner and made what is now known as the corrected Wallace roll, and upon that roll paid the freedmen.
The Cherokee Nation was directly interested in this procedure. The $75,000 set apart by the first act for the freedmen was taken from the funds of the Cherokee Natiou, and the surplus, if any, after paying the freedmen, Shawnees, and Delawares, was to be returned to the Cherokee Nation. The nation was therefore directly interested in the number of the freedmen existing in 1883 and entitled to share in this fund of $75,000 of Cherokee money.
The next question, of course, is whether the defendant, the Cherokee Nation, did take part in the investigation — whether the investigation was or was not an ex parte proceeding on the part of the United States, a proceeding binding, perhaps, upon the United States and the freedmen, but to which the Cherokee Nation was a stranger.
The defendant did not take part in the investigation but the amplest opportunity was afforded to the Cherokee government to do so ; and the opportunity to do so, in the opinion of the court, is as effective as if it had actually taken part and voluntarily been represented.
*185 The following is tbe commissioner’s rei>ort in regard to the course pursued by the defendant:
“ Hon. JOHN W. Noble,
“ Secretary of the Interior, Washington, D. 0.
“ Sir: I have the honor to present you the result of my investigations to determine, according to my instructions, who of the Cherokee freedmen, Delaware and Shawnee Indians were entitled to a per capita share in the distribution of the sum of $300,000 appropriated by act of Congress March 3d, 1883. In pursuance of my instructions I procured a commission from Judge Barker as commissioner of oaths, being satisfied that all evidence would have to be taken under oath. I then proceeded to Tahlequah and had an interview with Chief Mayes, and also obtained the opinions of many of the principal Cherokees as well as those of intelligent freedmen on the subject. I outlined my plan of operations to Chief Mayes, who approved it highly, but could not see how I would avoid imposition, which would result in great injury to the Cherokee Nation. I suggested that he appoint some person properly qualified, who should be instructed to be present at all examinations, and whose duty it should be to call my attention to any attempt at fraud, and who should see the manner in which my business was conducted, to avoid any possibility of fraud on my part, and on that of any connected with my office. This proposition he considered favorably, and tendered the position to Judge Wiley, who accepted the same on condition that he be given three clays in which to arrange his private business. As I was obliged to remain in Tahlequah several days waiting for copies of the Cherokee rolls, I informed him the delay would not inconvenience me. Upon -Judge Wiley’s return at the stipulated time he was informed by Chief Mayes that he had reconsidered the matter, consulted with others on the subject, and while he personally approved of the plan, he had concluded he was not empowered to make such appointment, as that power rested solely in the national council.”
In the previous case of the Delawares the relative numbers of the parties, in proportion to which the fund in controversy is to be apportioned, was settled by agreement, the whole number of the nation being placed at 26,771, made up as follows:
Cherokees by blood... 21,232
Adopted whites. 2, 011
Delawares. 759
Shawnees. 624
Creeks. 82
Choctaws. 11
Negroes. 2,052
Total 26,771
*186 The same proportion was adopted in the case of the Shawnees. Both cases have been to the Supreme Court, and the rights of the parties were considered upon that proportion.
In the present case the numbers are a matter of controversy. The complainants deny that the freedmen number only 2,052, and insist that the number of the corrected Wallace roll, 3,524, shall be taken as the true number of the freedmen existing’ in 1883, and that to it shall be added 3 per cent per annum for natural increase fronf 1883 until the time, respectively, when each fund in controversy was distributed among those who were Cherokees. by blood ; that is to say, with 3 per cent per annum from 1883 to 1886, from 1883 to 1890, and from 1883 to 1894. The defendant contends that the Wallace roll is not conclusive, but offers no opposing evidence.
The court believes that the roll affords the best evidence which exists or which can be procured. The large amount to be received by every individual complainant, more than $250 for each person — more than $1,000 for every family of the freedmen ; the unsettled state of the country, the scattered character of the population, the remote places in which they live, and the remote dates to which the investigation must extend — from 1866 to 1894 — are conditions which offer the strongest inducements to fraud on the one side, and to intimidations and dis-criminations on the other. It may be that the Wallace roll was extended beyond the true number of the persons entitled to be placed thereon j but if it was, the fault was with the Cherokee Nation, who could have contested every name that was placed upon it, and who had the means of exposing every error that may have existed j and the United States spared no pains to make the roll a true exhibit in the case. The court believes that the difficulties in arriving at a true result which existed then will be greatly multiplied now.
The court therefore takes the Wallace roll as furnishing the true number of the freedmen, 3,524. With,regard to the natural increase since 1883, to which time the Wallace roll relates, something remains to be said.
The complainants offer no evidence as to the other side of the proportion, the whole number of the nation; and there is no evidence to support that part of their case unless we rest upon the number taken in the previous cases. It is manifest, if there is to be natural increase allowed on the one side, that there *187 slioulcl be natural increase allowed on the other. The court is satisfied that the whole number before taken, 26,771, and made up as before stated, was substantially taken from a census or enumeration made by the nation at some time between 1880 and 1882. The court is therefore satisfied that this claim of natural increase is too uncertain to be accepted as a factor in determining the amount of the recovery. The conclusion of the court is that 1,472 — the difference between the number of freedmen, 2,052, which stands in the above statement, and 3,524, the number of freedmen which is given by the Wallace roll — should be added to the former whole number, 26,771, making 28,243, which shall be taken as the whole number of the Cherokee Nation, and 3,524 as the number of the freedmen for the purpose of distribution, and that the recovery of the complainants in the whole fund of $7,240,000 be in that proportion, giving as the amount of the recovery in this case, $903,365.
It is contended by the counsel for the complainants that the recovery here should not be based on that proportion, but that the court should award to the freedmen at the same per capita rate at which the native Cherokees distributed among themselves.
If these funds were the property of four joint owners it would be just to award to three of them, the. Delawares, Shawnees, and freedmen, the same amount, or the same proportionate amount, that.has been appropriated to themselves by the fourth, the native Cherokees. But this may not be the case. Under the decision of this court in the previous cases, affirmed by the Supreme Court, these funds are the common property of all Cherokee citizens. The same clause of the Cherokee constitution, which recognizes “all Indians” and freedmen and declares them to be citizens of the Cherokee Nation and classes them with “ native-born Cherokees,” also so recognizes and classifies “ whites legally members of the nation by adoption.” In the enumeration above given it appears that there are 2,011 adopted whites and 93 Creeks and Choctaws, making 2,104. They are not before the court, the jurisdictional act does not extend to them, but their equity in the fund, which is the subject of this litigation, may be as strong as that of the complainants or of those who are Cherokees by blood. The only evidence before the court in any of these three cases set *188 ting' forth the whole number of the Cherokee Nation enumerates these adopted whites, Creeks, and Choctaws as citizens and as parts of the whole number. The court, for the purposes of distribution of this fund, must assume them to be such and preserve their interests in it, if any they have. When the Ch erokee Nation paid away the money to those who are “ Cherokees by blood,” they appropriated not'only the shares of the Delawares, Shawnees, and freedmen, but also the share of the adopted whites and Indians, and thereby doubly swelled the per capita payments which they made to themselves. If the court were now to award to the Delawares, Shawnees, and freedmen this factitious amount per capita that was appropriated by the native Cherokees it might be a similar misappropriation of money equitably belonging to parties not before the court— money in which the complainants have no constitutional, or legal, or equitable right, and which is no more their money than their money was the property of the Cherokees by blood. The court does not intend to express an opinion concerning the constitutional rights of these adopted citizens in the common property of the Cherokee Nation ; but so long as they appear in the evidence in these cases as citizens, the court must assume them to be citizens, and as such recognize their possible rights.
This is not an action to recover damages in the nature of a suit at law, nor is it a proceeding in equity to wind up and dispose of the affairs and assets of a partnership.. It is simply a suit in equity, brought by the equitable owners of a specific fund to recover their proportionate share in the same. The jurisdictional act recognizes this principle, for it authorizes suits to be brought for the proportionate shares of the parties in funds derived from the sales or leasing of lands of the Cherokee Nation. The court can not go beyond this if it would, and no court of equity will award to a party more than he is legally and equitably entitled to, because a party having a right to share in the fund is not within the jurisdiction of the court.
A decree will be entered in this case following the form of that which was last entered in the case of the Delawares. In addition, it will be provided that the Secretary of the Interior will cause the Wallace roll to be further corrected by adding thereto descendants born since March 3,1883, and prior to *189 May 3,1894, and striking therefrom the names of those who have died or have ceased to be citizens of the Cherokee Nation, so that when thus amended and changed it shall represent the freedmen entitled to participate in the distribution of the fund now awarded to the complainant. To that end the Secretary of the Interior is authorized to appoint a commissioner to proceed to the Cherokee country and ascertain and report to the Secretary the facts necessary for the correction of the roll above described. The expenses of the commissioner will be a charge upon and paid out of the fund awarded by this decree. When a new and corrected roll is thus made and approved by the Secretary of the Interior he will cause the amount remaining of the fund awarded the complainants under this decree (after deducting the costs hereinafter directed to be paid by the complainants) to be paid and distributed to the freedmen entitled thereto, the cost of such distribution likewise being a charge upon this fund, pursuant to the act 2d March, 1895, section 11.
There is decreed to the attorney of the complainants for compensation and counsel fees, including the compensation of all associate counsel and the expenses and disbursements incident to the litigation, 2 per cent on the amount of the recovery, to wit, $18,067.30, which amount, it is adjudged, shall be paid by the defendant, the Cherokee Nation.
An there is further decreed to the attorney of the complainants, for compensation and counsel fees, including the compensation of all associate coup. -'1 and the expénses and disbursements incident to the litiga don, 4 per cent upon the amount of the recovery, to wit, $36,134.00, which amount, it is adjudged, shall be paid by the complainants, the freedmen of the Cherokee Nation, and shall be a charge upon and paid out of the fund hereinbefore awarded to them.
And on the motion and with the consent of the complainants there is allowed and decreed to the trustee for his compensation and expenses since the 20th day of November, 1890, when his appointment as trustee was approved by the Secretary of the Interior, the sum of $5,000, which it is adjudged shall be paid by the complainants and be a charge upon and paid out of the fund hereinbefore awarded to them.
If an appeal shall be taken, permission is reserved to the complainants’ attorney to apply for an additional allowance.
*190 The following findings of fact were subsequently filed:
The defendant, the Cherokee Nation, appropriated and paid to Cherokee citizens who were “Cherokees by blood,” $7,240,000, to the exclusion of the freedmen of the nation, represented by the complainant in this suit, they likewise being citizens of the nation, in the manner more fully and at large set forth in the complainant’s petition.
The court finds for the purposes of distribution in this suit that the whole number of the citizens of the Cherokee Nation entitled to participate in the above fund of $7,240,000 was 28,243, and the number of freedmen, citizens of the nation represented by the trustee, the complainant in this suit, was 3,524, and that their proportionate share or interest in the above fund is $903,365.
The court decided as conclusion of law that the complainant should recover for the use and benefit of the freedmen of the Cherokee Nation the sum of $903,365, which should be distributed and paid directly to the beneficiaries, the freedmen, individually, in the manner more specifically directed by the decree of the court in this case.
At the same time the following decree was entered:
This cause coming on to be heard upon the amended petition, answer, agreed facts, proofs, and arguments submitted by the parties, respectively, and the court having heard the same and considered the just rights in law and equity of the freedmen of the Cherokee Nation, including all persons who had been liberated by voluntary act of their owners, or by law, and all free colored persons who resided in the Cherokee country at the commencement of the rebellion and resided therein July 19, 1866, or returned thereto within six months thereafter, and their descendants who are settled and incorporated into the Cherokee Nation, in pursuance of the authority vested in the court by act of Congress entitled “An act to refer to the Court of Claims certain claims of the Shawnee and Delaware Indians and the freedmen of the Cherokee Nation, and for other purposes,” approved October 1,1890.
And it appearing to the court that under the provisions of article 9 of the treaty of July 19,1866, made by and between the Cherokee Nation and the United States, the said freedmen, who had been liberated by voluntary act of their former own *191 ers, or by law, and all free colored persons wlio resided in tbe Cherokee country at tbe commencement of tbe rebellion and were residents therein at tbe date of said treaty, or wbo bad returned thereto within sis months of said last-mentioned date, and their descendants, were admitted into and became a part of tbe Cherokee Nation and entitled to equal rights and immunities, and to participate in the Cherokee national funds and common property in the same manner and to the same extent as Cherokee citizens of Cherokee blood. .
It further appearing to the court that under and by virtue of an act entitled “An act making appropriations for current and contingent expens.es, and for fulfilling treaty stipulations with Indian tribes, for the fiscal year ending June 30,1894,”' approved March 3,1893, it was provided for the payment to the Cherokee Nation of the sum of $8,595,736, the same to be in full consideration of all the right, title, interest, and claim which said nation might have in the lands lying west of 96° west longitude, commonly known as the Cherokee Outlet, and it further appearing that of the- said sum of $8,595,736 the sum of $295,756 was appropriated by said act out of the Treasury of the United States and made immediately available, and that the balance thereof, to wit, $8,300,000, was made payable in five annual installments, the first to be payable on the 4th of March, 1895, and all deferred payments to bear interest at the rate of 4 per centum per annum, and that á sufficient amount of the money provided in said act should be paid for the purchase of said Cherokee Outlet to pay the Delawares and Shawnees their pro rata share of said outlet, should remain in the Treasury of the United States until the status of said Delaware and Shawnee Indians should be determined by the courts of the United States before which their suits were then pending, also a sufficient amount to pay the freedmen, who are Cherokee citizens, as the same shall be determined by the courts; and the said act further providing that if the legislative council of the Cherokee Nation should deem it more advantageous to their people they might issue a loan for the i-U'incipal and interest of the deferred payments, pledging said amounts of interest and principal to secure payment of such debt; and it appearing to the court that said Cherokee Nation has borrowed from the Union Trust Company of New York the sum of $6,640,000, and pledged as security therefor *192 tbe four payments as aforesaid, falling due after tbe 4th day of March, 1895, and that the payment falling due on the said 4th day of March, 1895, amounting to $1,000,000, has been retained in the Treasury of the United States from which to pay the Delawares, Shawnees, and freedmen, as hereinbefore set forth; and it further appearing to the court that the said $6,640,000, so borrowed by the Cherokee Nation, has been distributed to the Cherokee citizens of Cherokee blood, to the exclusion of the complainants, the aforesaid freedmen and free colored persons and their descendants, as well as the two funds of $300,000, each distributed by the act of the Cherokee council, of date April 26,1886, and November 25, 1890, as charged in the amended petition in this case.
It is ordered, adjudged, and decreed that so much of the acts of the Cherokee national council of date April 26,1886, Noveno - ber 25, 1890, and May 3, 1894, as restricts the distribution of funds which were derived from the public domain and from the sale of lands by the Cherokee Nation to the Government of the United States, to citizens of the nation by blood, be held and decreed void and contrary to and in derogation of the constitution of the Cherokee Nation and the provisions and stipulations of article 9 of the aforesaid treaty of July 19,1866, with respect to the rights of said freedmen, who had been liberated by voluntary act of their former owners, or by law, and all free colored persons who resided in the Cherokee country at the commencement of the rebellion and who on the said date resided therein, or who returned thereto within six months thereafter, and their descendants; and that the said Cherokee Nation or its trustees, the United States, account for, render, and pay to the aforesaid freedmen and free colored persons and their descendants, out of any funds of the said nation in its national treasury, or in the custody of the U nited States as trustee, or held by agreement between said nation and the United States for the purpose of satisfying the decree herein rendered, not specifically appropriated by law to other purposes, or out of funds which may hereafter come to the possession of said trustee belonging to the Cherokee Nation, a sum equal to the aggregate amount which said freedmen and free colored persons and their descendants would have received if the before-mentioned void and unconstitutional restrictions in said statutes had not existed.
*193 And it is further adjudged and decreed that the complainants in this suit and those whom they represent, being the freedmen and free colored persons aforesaid and their descendants, are entitled to participate hereafter in the common property of the Cherokee Nation in the same manner and to the same extent as Cherokee citizens of Cherokee blood or parentage may be entitled, and that in the distribution of the proceeds and avails of the public domain or common property of the nation among the citizens thereof by distribution per cap-ita at any time hereafter, the defendant, the Cherokee Nation, and the defendant, the United States, as trustee of the Cherokee Nation, be enjoined and prohibited from making any discrimination between the Cherokee citizens of Cherokee blood or parentage and Cherokee citizeus who are or were freedmen who had been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the Cherokee country at the commencement of the rebellion, and were residents therein at the date of said treaty, or who returned thereto within six months thereafter, and their descendants, to the prejudice of the latter.
It being understood that the freedmen and.their descendants and free colored persons above referred to shall include only such persons of said class as have not forfeited or abjured their citizenship of said Cherokee Nation at the date of the entering of this decree.
And it is further adjudged and decreed with respect to the participation of said freedmen and free colored persons aforesaid and their descendants in the three funds referred to in the three statutes of the Cherokee Nation hereinbefore declared to be void and unconstitutional, that the Oherokees by blood having received a sum which amounts at the date hereof to $7,240,000, in which the said freedmen and free colored persons aforesaid and their, descendants were entitled to have and participate in the distribution of said sum; and for the purpose of fixing an amount thereof which ought to be distributed among said freedmen and free colored persons and their descendants, it is further adjudged and decreed that said freedmen and free colored persons and their descendants -are entitled to have and receive the sum of $903,365 out of the sum last aforesaid, after deducting the amounts hereinafter allowed *194 and decreed to be paid to the trustee herein as his compensation for services as trustee and the attorney of record of the plaintiff herein, to be paid by the Secretary of the Interior to the freedmen and free colored persons aforesaid and their descendants, per capita, who would have been entitled to receive the same if the unconstitutional restrictions and dis-criminations in said statutes had not existed. Such payments to be made upon a roll of said freedmen and free colored persons and their descendants as prepared and approved by the Secretary of the Interior in accordance with provisions hereinafter set forth in this decree.
And it is further ordered, adjudged, and decreed that for the purpose of enrolling and enumerating the freedmen and colored men aforesaid and their descendants who are entitled to participate in the funds hereinbefore decreed to them; and it further appearing to the court that an enumeration of the aforesaid freedmen, free colored persons, and their descendants was made and approved under and by virtue of an act of Congress, by the Secretary of the Interior Department of the United States, and that said census of the aforesaid freedmen and free colored persons and their descendants was known as the “Wallace roll,” and that said Wallace roll contained the number of said persons as were in existence on the 4th of March, 1883, and that the number of said persons shown thereby was 3,524; and it appearing to the court that the defendant, the Cherokee Nation, did not participate in the preparation of said Wallace roll, but that ample opportunity was afforded it to do so: It is therefore adjudged and decreed that its refusal to do so is as effective as if it had actually taken part in the preparation of said Wallace roll, and it is concluded thereby. It is adjudged and decreed that said Wallace roll, showing 3,524 of such persons, is approved by this court and taken by it as furnishing the true number of the freedmen, to wit, 3,524, as being the number of freedmen to be entitled, together with the other citizens of the Cherokee Nation, to be taken as a basis in estimating the amount of money to be decreed to be paid plaintiffs in this action.
It is further adjudged and decreed that the whole number of Cherokee citizens as being entitled to share in the distribution of the aforesaid sum of $7,240,000 shall be taken as 28,243, *195 and for tbe purpose of tbe distribution of tbe aforesaid sum of $903,365 among said freedmen, free colored persons, and tbeir descendants, less tbe amounts bereinbefore and hereafter directed to be deducted therefrom, tbe Secretary of tbe Interior is directed to cause tbe Wallace roll aforesaid to be further corrected by adding thereto descendants born since March 3,1883, and prior to May 3, 1894, striking therefrom tbe names of those who have died or have ceased to be citizens of tbe Cherokee Nation between tbe aforesaid dates, so that when thus amended and changed it shall represent tbe number of freedmen, free colored persons, and tbeir descendants, aforesaid entitled to participation in tbe distribution of tbe fund now awarded to tbe complainant.
To that end tbe Secretary of tbe Interior is authorized to appoint a commissioner to proceed to the Cherokee Nation and ascertain and report to tbe Secretary of tbe Interior the facts necessary for tbe correction of tbe aforesaid Wallace roll. And in tbe correction of said roll, as provided herein, tbe Cherokee Nation shall have tbe right to have a representative present, to advise concerning the same, and who shall have full cognizance of all corrections made thereto. When a new and corrected roll is thus made and approved by tbe Secretary of tbe Interior, be will cause tbe amount remaining of tbe fund awarded tbe complainants under this decree, after deducting tbe cost, hereinafter directed to be paid by tbe complainants, to be paid and distributed to tbe freedmen, free colored persons, and tbeir descendants aforesaid entitled thereto, not to exceed tbe sum of $256.34 per capita, subject to tbe fees-of counsel and other costs and expenses herein provided for, tbe expense of said commissioner and costs of such distribution likewise being a charge upon this fund and amount decreed in favor of tbe complainants herein, and tbe same shall be deducted therefrom by said Secretary of tbe Interior.
Any balance of tbe amount hereby decreed to said plaintiffs, and not consumed in the per capita payment herein provided for, shall be paid over to tbe Cherokee Nation as other moneys provided for in tbe agreement between said nation and tbe Secretary of tbe Interior bereinbefore referred to.
There is further adjudged and decreed to Eobert H. Kern, tbe attorney of record for complainant, for compensation and *196 counsel fees, including’ tbe compensation of all associate counsel and the expenses and disbursements incident to the litigation, 2 per cent of the amount of the recovery, to wit, $18,067.30, which amount it is adjudged shall be paid by the Secretary of the Treasury of the United States to the said Eobert H. Kern, out of the funds hereinbefore mentioned, now in his hands, and that the same when so paid shall be charged to the defendant, the Cherokee Nation.
And there is further decreed and adjudged to the said Eobert H. Kern, attorney of record of the complainants, for compensation and counsel fees, including the compensation of all associate counsel and the expenses and disbursements incident to the litigation, 4 per cent upon the amount of the recovery, to wit, $36,134, which amount it is adjudged shall be paid by the Secretary of the Treasury of the United States out of the funds hereinbefore mentioned, now in his hands, and shall be a charge against the freedmen of the Cherokee Nation and paid out of the funds hereinbefore awarded to them.
It is further adjudged and decreed that Moses Whitmire, as trustee of the complainants, be allowed for compensation for his services as such, including expenses and disbursements made by him, the sum of $5,000, which amount it is adjudged shall be paid to said trustee by the Secretary of the Treasury of the United States, out of the funds hereinbefore mentioned, now in his hands, and shall be a charge against the freedmen of the Cherokee Nation and paid out of the funds hereinbefore awarded to them.
It is further adjudged that the Secretary of the Interior pay the aforesaid amount decreed to be paid by him out of the aforesaid funds now in the Treasury Department of the United States.
And it is further ordered, adjudged, and decreed that the defendant, the Cherokee Nation, pay the costs of this suit, and that if this judgement and decree be'not carried out and satisfied within six months from the date hereof the claimant may apply to this court for such further order, relief, or remedy as the plaintiff herein may deem necessary; and that if any further proceeding be had under this decree, the rights of the attorneys and counsel for the plaintiff herein to further costs and allowances be reserved to be hereafter determined and fixed by the court, and the court reserves the right to make all such further orders in aid hereof as to it may seem meet.